## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

U.S. CITIZEN,

*Address withheld*

       Plaintiff,

U.S. COMPANY

*Address withheld*

       Plaintiff,

   v.

U.S. AGENCY FOR INTERNATIONAL
DEVELOPMENT,

Address:
Ronald Reagan Building
Washington, D.C. 20523-1000

       Defendant,

MICHAEL MCCORD, in his official
capacity as Deputy Mission Director,
U.S. Agency for International
Development, Afghanistan

Address:
American Embassy Kabul
Unit 6180 Box 0060
DPO AE 09806-0060

       Defendant,

Case No. 19-cv-1012

UNKNOWN AGENTS
Of the U.S. Agency for International
Development,

Address:
Unknown

Defendants.

## COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiffs U.S. CITIZEN and U.S. COMPANY, by their undersigned counsel,

hereby file this Complaint and Demand for Jury Trial and state the following:

## I. INTRODUCTION

1.      This is a case in which Plaintiff U.S. COMPANY was suddenly

forbidden to perform work under awards from the U.S. Agency for International

Development (USAID) for reasons never disclosed to Plaintiffs and, upon request for

the reasons, intentionally withheld from them.  The decision was arbitrary and

capricious from the outset, given Plaintiffs' sterling reputations and historic

performance of contracts.  But the decision also deprived Plaintiffs of a liberty

interest without due process of law, as they have been given neither notice of the

basis for which U.S. COMPANY was excluded nor an opportunity to rebut that

basis.  And it also violated the Federal Acquisition Regulations.

## II.  PARTIES

2.      U.S. CITIZEN is a dual citizen of the United States and Afghanistan. He was born in Seattle, Washington, graduated from an Ivy League university, and holds a Master of Business Administration degree.  U.S. CITIZEN is the Chairman and sole proprietor of U.S. COMPANY.

3.      U.S. COMPANY is a sole proprietorship established and operating under the laws of the Commonwealth of Virginia.

4.      The U.S. Agency for International Development is a federal agency.

5.      Michael McCord served, at all relevant times, as the Deputy Mission Director for USAID's mission in Afghanistan.  Mr. McCord is named as a defendant in his official capacity.

6.      The unknown defendants are other government officials who participated in the decision to exclude Plaintiffs or to deny them notice of the basis therefor or an opportunity to rebut that basis.

## III.  JURISDICTION & VENUE

7.      This court has jurisdiction under U.S. Const. art. III, § 2, and 28 U.S.C. § 1331 because the case arises under the Constitution and laws of the United States.

8.      Venue is appropriate under 28 U.S.C. § 1391(e)(1) because Defendant USAID is headquartered in this district or, alternatively, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

## IV.  **STATEMENT OF THE CASE**

### A.  **Background**

9.     U.S. COMPANY was founded in 2009 and has a branch office in Kabul, Afghanistan.

10.     U.S. COMPANY provides a full range of professional business services including accounting, payroll, auditing, and tax services.  Since its inception, U.S. COMPANY has performed hundreds of prime and subcontracts primarily for U.S. government agencies, including the Department of State, the Department of Defense, and USAID.

11.     U.S. COMPANY and its key individuals have been vetted and cleared dozens of times through both government and private due-diligence processes—most recently for a grant award made by PRIME CONTRACTOR 1 in 2017.  U.S. COMPANY has been fully vetted by TRACE International, and has been certified by that globally-recognized organization as having successfully gone through TRACE International's gold standard in due diligence. *See* Ex. 1.

12.     U.S. COMPANY currently employs hundreds of staff, mostly Afghan nationals, and has short-term consultants in all 34 provinces in Afghanistan.  U.S. COMPANY's contribution to the U.S. mission and the economic development of Afghanistan is thus substantial.  U.S. COMPANY carefully vets its own employees through compiling extensive background information, verifying credentials, contacting references via mail and telephonically, and searching 60 restricted party lists through a service called Visual Compliance.

13.     U.S. COMPANY has obtained International Standards Organization

(ISO) 9001 certification for quality management, which signifies that U.S.

COMPANY ensures that its products and services consistently meet customer

requirements and that quality is consistently monitored and improved.

14.     U.S. COMPANY has annually received a clean, unqualified audit of its

financial statements.

15.     U.S. COMPANY routinely receives excellent contractor performance

assessment reports and has been able to build a customer base as a result of its

solid reputation in an environment that is challenging given the wartime conditions

and instability.

### B. Sudden Termination of Contracts

16.     On June 26, 2017, PRIME CONTRACTOR 1 received a notice of

ineligibility issued by USAID/Afghanistan directing DAI to terminate U.S.

COMPANY's subcontract under a USAID task order.

17.     According to PRIME CONTRACTOR 1, it received notice on that day

that USAID determined U.S. COMPANY to be ineligible to receive the subcontract

award.  U.S. COMPANY had not, and still has not, received any notification directly

from USAID regarding its termination from the subcontract.

18.     On June 29, 2017, PRIME CONTRACTOR 1 terminated U.S.

COMPANY's subcontract for convenience.  *See* Exhibit 2.

On July 3, 2017, U.S. COMPANY was notified by PRIME CONTRACTOR 2 that

USAID had directed the termination of U.S. COMPANY's subcontract under a

USAID prime award.  That notice included USAID's finding that U.S. COMPANY

was no longer eligible to receive the subcontract, but it provided no explanation for

this recent change in eligibility. *See* Exhibit 3.

19.     On July 5, 2017, U.S. COMPANY received an email from PRIME

CONTRACTOR 3, providing a stop-work notification for a purchase order under

another USAID award.  Again, U.S. COMPANY received neither notice from

USAID nor any explanation for the ineligibility findings.

20.     These terminations impinge upon U.S. COMPANY's interests in doing

business with the U.S. government.  Moreover, the reason for the terminations—

that U.S. COMPANY was deemed ineligible for award by USAID—make it

impossible for U.S. COMPANY to subcontract for these or other prime contractors

or to hold prime contracts in its own right.  It will also impinge on U.S.

COMPANY's ability to do business with private clients.

21.     As a result of USAID's actions, Plaintiffs have been *de facto* debarred

from doing business with USAID.  This impinges on interests protected by the Due

Process Clause.

### C. Prescribed Vetting Process

22.     The aforementioned subcontracts informed U.S. COMPANY that it

would be subject to USAID Mission Order 201.05.  That Mission Order imposes

vetting requirements on "[a]ny proposed *non-U.S.* recipient" of a USAID contracts

and assistance awards, at any tier.  Mission Order 201.05, App'x A §§ 1(a), 1(b)

(emphasis added).

23.     Plaintiff U.S. COMPANY is a U.S. company.  Plaintiff U.S. CITIZEN is

a citizen of the United States.  Thus, vetting was not required under Mission Order

§§ 1(a)-(b).

24.     The same Mission Order provides, "Even if vetting would not otherwise be required under these rules, vetting will be conducted whenever USAID has reason to believe that the Awardee or Sub-awardee could be a Prohibited Party." *Id.* § 1(e).

25.     "Prohibited Party" is defined as "an individual or entity that USAID knows or has reasonable grounds to suspect (i) supports or has supported terrorist activities, (ii) is or has been engaged in terrorist activities, (iii) poses a significant risk of committing terrorist activities, or (iv) is or has been engaged in other activities which are contrary to the national security or foreign policy interests of the United States." *Id.* (Definitions).

26.     Neither Plaintiff has ever been told that USAID had "reason to believe" that U.S. COMPANY could be a "Prohibited Party" and thus subjected U.S. COMPANY to vetting, let alone what the reason could be for such a belief.

27.     The Mission Order provides further, "Once an ineligibility determination has been made, the cognizant CO or AO is responsible for communicating with the prime Awardee or, if applicable, the Subawardee being vetted (with a copy to the prime Awardee), using the appropriate language shown in Appendix C." *Id.* § 5(b).  Appendix C to the Mission Order sets forth a form letter notifying a putative implementing partner that they have been determined ineligible for the subject award.

28.     Neither Plaintiff has ever received the notification prescribed in Section 5(b) of the Mission Order and appended thereto.

29.     Plaintiff U.S. CITIZEN emailed the Kabul Vetting Support Unit (VSU) on June 17, 2017, to request more information about the basis for his company's ineligibility.  Ex. 4.  He made clear that "a US security vetting rejection would be catastrophic to [his] business" and reiterated that Plaintiffs had "been cleared by US AID VSU dozens of times before."  *Id.*  Plaintiff U.S. CITIZEN followed up on June 28, 2017, with three specific questions:

> 1.  Do U.S. companies owned 50% or more by a U.S. citizen not require local security vetting?
>
> 2.  If I have unwittingly hired someone in my . . . company that has a security concern, shouldn't USAID VSU inform me so that I may terminate him/her as a matter of security of U.S. interests?
>
> 3.  U.S. COMPANY's management all have MRPT clearances. May I submit each U.S. COMPANY employee one by one to Kabul RSO for background investigation?

*Id.*

30.     These emails did result in one generic reply on July 2, 2017.  That reply did not answer any of U.S. CITIZEN's questions, however.  The email merely stated, "In the event of an ineligibility finding, notice will be given to the prime awardee with all of the information that can be shared."  On information and belief, this notice and information were never provided.

31.     Even if the Mission Order's procedures had not applied, then Plaintiffs should have been subject to the contractor-responsibility determinations in the Federal Acquisition Regulation (FAR).

32.     The FAR provides due-process safeguards before a putative contractor or subcontractor may be suspended or debarred from federal awards.  *See* 48 C.F.R.

§§ 9.406-3 (debarment), 9-407-2 (suspension). Those due-process safeguards include written notice, a copy of the administrative record, and the opportunity to be heard in person before the contractor can be suspended or debarred. *Id.* These safeguards are not discretionary, but are, instead, necessary to protect contractors' constitutional rights. *See Old Dominion Dairy Prods. v. Sec'y of Def.*, 631 F.2d 953, 963 (D.C. Cir. 1980) (contractor entitled to due process, including opportunity to be presented with facts and to respond, before it can be found nonresponsible on basis of business integrity); *NEIE, Inc. v. United States*, 2013 WL 6406992, **16-24 (Fed. Cl. 2013); *Afghan Am. Army Servs. Corp. v. United States*, 106 Fed. Cl. 714 (2012).

### D. Lack of Notice to Plaintiffs

33.     Neither Plaintiff has ever received any notice directly from USAID.

34.     None of the notices from prime contractors contained any explanation of the basis on which USAID was deeming U.S. COMPANY ineligible.

35.     The July 2, 2017 e-mail response mentioned above, which merely summarized USAID's policy and process for ineligibility findings, neither addressed U.S. CITIZEN's questions nor stated any basis on which U.S. COMPANY had been found ineligible.

### E. Lack of Opportunity to Be Heard

36.     On July 5, 2017, U.S. COMPANY requested through counsel that USAID reconsider its determination.

37.     U.S. COMPANY requested that, in the alternative, USAID "provide [U.S. COMPANY] sufficient information about USAID's vetting concerns so that they can be addressed and remedied."

38.     On August 6, 2017, Michael McCord, Deputy Mission Director, USAID, responded to U.S. COMPANY's request.

39.     Mr. McCord's letter merely regurgitated the Mission Order's admonition that "vetting will be conducted whenever USAID has reason to believe that the Awardee or Sub-awardee could be a Prohibited Party," and that "all ineligible decisions are final . . .  without a reconsideration process."

40.     Mr. McCord contended further that "the Mission's discretion to vet is not limited by the nationality of the organization."

41.     Finally, Mr. McCord stated (notwithstanding the text of the Mission Order) that "it is not the Mission's policy to send ineligibility letters to Subawardees," but, rather, "to correspond directly with the prime award holder regarding determinations of sub-awardee eligibility or lack thereof."

42.     Defendant McCord told U.S. COMPANY to "contact the Kabul Vetting Support Unit, kblaidvsu@usaid.gov, with any further questions."

43.     In short, Defendants have left Plaintiffs in the dark about why they were vetted in the first place, clueless as to what caused U.S. COMPANY to be deemed ineligible, and without recourse to regain U.S. COMPANY's eligible status.

## F.  Heightened Concerns

44.     Segments of the Afghan government have proven themselves willing to set up obstacles to U.S. COMPANY as punishment for U.S. COMPANY refusing to engage in widespread corruption.  In other words, USAID vetting has become a tool for Afghan political institutions to target implementers who refuse to go along with illegal conduct.

45.     Plaintiffs have and Defendants should have, therefore, heightened concerns about the plausibility of any expressed concerns that have caused, or contributed to, U.S. COMPANY's ineligibility determination.

## V.  CLAIMS

### Count I
### (Arbitrary, Capricious, or Abusive Agency Action)
### (Defendant USAID)

46.     Paragraphs 9-45 are incorporated herein.

47.     Defendants' decision to exclude Plaintiffs from awards was a final agency action, reviewable under the Administrative Procedure Act for arbitrariness, caprice, or abuse of discretion.  5 U.S.C. §§ 704, 706(2)(A).

48.     Given Plaintiffs' unimpeachable record of performance until the point of termination, the heightened concerns illustrated in § IV.F, *supra*, and the lack of any stated basis for the exclusion, it was arbitrary, capricious, or an abuse of discretion to exclude Plaintiffs from USAID awards.

49.     The exclusion was also arbitrary, capricious, or abusive for reasons that may be uncovered through discovery.

WHEREFORE, Plaintiffs request the relief stated in their Requests for Relief.

### Count II
### (Deprivation of Due Process)
### (All Defendants)

50.     Paragraphs 9-45 are incorporated herein.

51.     The result of Defendants' vetting decision is a *de facto* debarment, which triggers Due Process Clause protections.

52.     Defendants gave Plaintiffs no notice of the basis on which they were

excluded from USAID awards.

53.    Defendants gave Plaintiffs no opportunity to rebut that basis.

54.    In this regard and in others that may be uncovered through discovery, Defendants violated Plaintiffs' due-process rights.

55.    This claim is brought against the federal agencies directly under the Constitution or under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706(2)(B), and against the individual defendants (known and unknown) under *Bivens v. Six Unknown Federal Agents*, 403 U.S. 388 (U.S. 1971) and its progeny.

WHEREFORE, Plaintiffs request the relief stated in their Requests for Relief.

## Count III
## (Violation of Federal Acquisition Regulations)
## (All Defendants)

56.    Paragraphs 9-45 are incorporated herein.

57.    Alternatively, even if the Mission Order had not applied, Plaintiffs would have been entitled to the safeguards provided in the Federal Acquisition Regulation, 48 C.F.R. §§ 9.406-3 (debarment), 9-407-2 (suspension).

58.    Defendants' failure to provide written notice, a copy of the administrative record, and the opportunity to be heard in person violated these regulations.

WHEREFORE, Plaintiffs request the relief stated in their Requests for Relief.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs request that this Honorable Court grant them

declaratory and injunctive relief as follows:

A. Declaring that Defendants' actions were arbitrary, capricious, or an abuse of discretion;

B. Declaring that Defendants' actions deprived Plaintiffs of their liberty interests without due process of law, in violation of the Fifth Amendment of the U.S. Constitution;

C. Enjoining Defendants to provide notice to Plaintiffs of the reason why U.S. COMPANY was deemed ineligible for USAID awards; enjoining Defendants to consider in good faith any rebuttal Plaintiffs choose to submit in response to said basis; and enjoining Defendants to revisit their ineligibility determination in light of any such rebuttal;

D. Declaring that Defendants' actions violated the Federal Acquisition Regulations; and

E. Granting such other relief as the Court deems appropriate.

Dated:      April 11, 2019                    Respectfully submitted,

                                              _____/s/ Jason C. Lynch_____
                                              Jason C. Lynch (D.C. Bar No. 1016319)
                                              Andy Liu (D.C. Bar No. 454986)
                                              Robert Nichols (D.C. Bar No. 452067)
                                              NICHOLS LIU LLP
                                              700 6th Street NW, Suite 430
                                              Washington, DC  20001
                                              Tel: (202) 846-9800
                                              jlynch@nicholsliu.com
                                              aliu@nicholsliu.com
                                              rnichols@nicholsliu.com

                                              *Counsel for Plaintiffs U.S. CITIZEN and
                                              U.S. COMPANY*

# EXHIBIT 1



The internationally recognized organization working with companies to raise anti-bribery compliance standards worldwide.

www.TRACEinternational.org

This certifies that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

has completed a comprehensive background review and is TRACE Certified.

**July 15, 2016 - July 14, 2017**

**TRACE*certification* ID:** ▮▮▮▮▮▮▮



_Alexandra Wrage, TRACE President_

*TRACEcertification is not a guarantee against past or potential wrongdoing by the certified entity or a guarantee against potential liability. A summary of any red flags identified during the TRACEcertification review is included in the report, but not all red flags preclude TRACEcertification. Companies doing business with this TRACE Certified entity should always request a full copy of the underlying report. To view a complete list of TRACE Certified entities, please visit the TRACE Intermediary Directory at https://tpms.TRACEinternational.org/IntermediaryDirectory.*

# EXHIBIT 2

██████         ██ ███████        ████

June 29, 2017

██████████████████████ ██
██████████ ██████
██████████████████████████████████████
Kabul, Afghanistan

Subject:        Termination for Convenience
                Subcontract No. ████████████████████,
                Under the ████████████████ Task Order,
                USAID Prime Contract Number ████████████2

Dear ████████,

██ hereby serves notice of Termination for Convenience of the subject Subcontract Agreement. This Termination for Convenience is effective immediately.

██ is terminating the subcontractor for the following reason. The Subcontractor is deemed ineligible to receive the subject subcontract award per the ineligibility notice received from USAID/Afghanistan on June 26th, 2017. Therefore, ██ in consultation with the USAID/Afghanistan has decided to terminate this subcontract for convenience. The Subcontractor was notified via phone of the subcontract's termination decision on June 28th, 2017, by ████████ ████████████.

████████████████████ must take all the necessary steps to bring the Subcontract to a close in a prompt and orderly manner, making every reasonable effort to keep expenditures to this purpose to a minimum. No costs incurred after June 26th, 2017 will be paid by ██ unless authorized in advance by the undersigned or his/her designee.

██ requests that ████████████████ submit a final invoice within 5 (five) calendar days of the termination or no later than July 2nd, 2017. The amount shall only include all allowable costs and services delivered under this Subcontract, not previously paid, for the performance of this Subcontract before the effective date of the termination. Any claims for expenses must be accompanied by reports and deliverables required by the Subcontract. The amount paid shall be subject to the availability of funds from USAID and any other pertinent provisions of the Subcontract.

██ appreciates the work that ████████████████ has performed under the ██ project. If you have any questions about this termination notice or any close-out matter, please contact me via e-mail at ████████████████. Any program related questions should be directed to ████████ ████, Chief of Party, via e-mail at ████████████████.

Sincerely,

██████████████

██████████
Contracts Manager

cc: 

# EXHIBIT 3

July 3, 2017

█████████████ Kabul, Afghanistan

**Ref: Suba**ward No. ██████████ under Prime Award No. ████████████████████

**Subject:** Notification of Termination of Subcontract

Dear Mr. ██████

In accordance with FAR 52.249-6, Termination (Cost-Reimbursement) and subcontract clause I.12 Termination and Suspension, and at the direction of the U.S. Government, ██████ hereby terminates for convenience the referenced ████████████████████ subcontract, effective July 3, 2017. Effective immediately, ██████ shall proceed with the following actions, without prejudice in determining or adjusting any amounts due under this clause:

(1) Stop work as specified in the notice;

(2) Place no further subcontracts, orders or otherwise enter into any obligations under the referenced subcontract, except as necessary to execute this termination; and

(3) Terminate all ongoing subcontracts, orders and/or consultant engagements related to the referenced subcontract.

██████ shall immediately comply with this order and take all reasonable steps to minimize the incurrence of costs related to the work terminated and discontinue all subcontract related activities as rapidly as practicable. Please note that the only allowable labor under this subcontract after the effective date of this termination shall be labor that is directly necessary to effect the termination.

We appreciate the fact that there may be costs associated with the early termination of obligations ██████ has entered into in support of activities authorized under the referenced subcontract. Please provide a brief termination plan identifying actions necessary to effect this termination and an estimate of total subcontract costs with any termination related costs specifically identified. Please see Attachment A, letter from USAID/Afghanistan dated July 3, 2017 for additional information.

Regards,

Senior Contracts Manager

Attachment A – Letter from USAID Afghanistan dated July 3, 2017



July 3, 2017

█████████████

Kabul, Afghanistan
Phone: █████████████
Email: █████████████████

Reference: ████████████████████████████

Subject:   Cancellation of Sub-Contract with█████████████████

Dear Mr. ██████

Pursuant to Section H.9 (Vetting Requirement), Sub-Section (a),  paragraph (ii), of the referenced Task Order,  "the Implementing Partner (IP) must complete and submit a "USAID Information Form" for: …Each subcontractor or subcontractor of a subcontractor, regardless of the tier, valued at $25,000 or more, that is non-U.S entity."

██████████████████ did not include as part of its proposal submitted in response to RFTOP No. ████ ████████████████████████████, a Vetting Approval for the proposed subcontractor ████████████████████ budgeted at ███████████ for the life of the program (i.e. 5 years).

The █████ subcontractor was included under Section H.3 (Consent to Subcontract) of the referenced Task Order, but the Office of Acquisition and Assistance did not receive any evidence of the Vetting Approval process made by ██████████████████ for it.

Now, USAID has determined that████████████████████████ is **no longer** eligible to receive this subcontract funded by USAID.  Therefore, ████████████ is instructed to cancel any subaward with ████████████████ Additionally, ████████████ is instructed to provide a copy of the ██████ vetting approval issued by USAID for this subcontractor and notify the Contracting Officer how much has been paid to date for services on the subcontract with █████████ ████████████.

Sincerely,

George Boateng
Contracting Officer

# EXHIBIT 4

---------- Forwarded message ---------
From: Kabul USAID VSU <KBLAIDVSU@usaid.gov>
Date: Sun, Jul 2, 2017 at 1:02 PM
Subject: Re: Security vetting of 100% U.S. owned company
To: ███████████████████████████

Dear Sir,

In order to protect the national security interests of the United States and the use of United States government funds, USAID takes reasonable and appropriate steps to ensure that neither USAID funds nor USAID-funded activities, inadvertently or otherwise, provide funds, goods, services, or other material support to or for the benefit of prohibited parties.  As such, USAID completes terrorist financing risk assessments prior to the request for any program funds and conducts vetting on USAID awards and sub-awards.  USAID reserves the right to conduct vetting for any awardee or sub-awardee as appropriate.

In the event of an ineligibility finding, notice will be provided to the prime awardee with all of the information that can be shared.  An organization that is deemed ineligible will no longer be considered for the award that triggered the vetting request, however, that organization may apply for future awards as it is mission policy to re-vet entities based on information available at the time of determination.

For questions regarding the U.S. Embassy Regional Security Office, please contact that office directly.

Regards,

Kabul Vetting Support Unit

On Wed, Jun 28, 2017 at 9:08 AM, ██████████████████████████ wrote:
Dear Kabul VSU,

I am formally requesting your help with a few questions:

1. Do U.S. companies owned 50% or more by a U.S. citizen not require local security vetting?
2. If I have unwittingly hired someone in my 200 person company that has a security concern, shouldn't USAID VSU inform me so that I may terminate him/her as a matter of security of U.S. interests?
3. ████ management all have MRPT clearances. May I submit each ████ employee one by one to Kabul RSO for background investigation?

We are looking forward to hearing from you.

Best regards,

████████



Please note working hours in Afghanistan are 8:00 AM to 4:00 PM (GMT+4:30) Saturday through Wednesday.

This electronic message may contain information that may be confidential and privileged.  Do not forward or otherwise share this email without permission. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

On Sat, Jun 17, 2017 at 8:41 AM, ████████████████████ > wrote:
Dear USAID Kabul VSU,

Hope this email finds you well.

On Wednesday, I was informed by ███ that ███ was shortlisted for the USAID ███████████, however, our security vetting came back as rejected from USAID VSU.

I hold an MRPT clearance from Diplomatic Security and am the 100% owner of ████████████████████. I understand U.S. companies owned 50% or more by a U.S. citizen do not require security vetting. However, because I am a dual Afghan - American national, out of an abundance of caution, I have filled out the USAID vetting form.

███ has almost *exclusively* served on ████ U.S. Department of State, USAID and U.S. Department of Defense prime and subcontractors in Afghanistan over the past 8 years. Therefore, a US security vetting rejection would be be catastrophic to my business because I am concerned it may affect my current and future awards. Since we have been cleared by USAID VSU dozens of times before, I suspect this may be a confusion or the wrong information was submitted.

What may I do to update this?

Best regards,
████



Please note working hours in Afghanistan are 8:00 AM to 4:00 PM (GMT+4:30) Saturday through

Wednesday.

This electronic message may contain information that may be confidential and privileged.  Do not forward or otherwise share this email without permission. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

--

Best regards,



Please note working hours in Afghanistan are 8:00 AM to 4:00 PM (GMT+4:30) Saturday through Wednesday.

This electronic message may contain information that may be confidential and privileged.  Do not forward or otherwise share this email without permission. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.